IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VERONICA E. MONTELONGO,

        Plaintiff,

      v.

CHASE MANHATTAN MORTGAGE
CORPORATION, a New Jersey
corporation,

        Defendant.
_____

Civil No. 04-1376-AS

OPINION AND ORDER

ASHMANSKAS, Magistrate Judge:

**OVERVIEW OF COMPLAINT**

Veronica E. Montelongo filed a complaint against her former employer, Chase Manhattan Mortgage Corporation (Chase), alleging claims for race discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e. Montelongo also alleges state claims for race discrimination and retaliation under Or. Rev. Stat. Ch. 659A. Specifically, Montelongo alleges that Chase acted unlawfully by: (1) creating and/or maintaining a hostile work environment; (2)

1 - OPINION AND ORDER                         {LB}

interfering with the processing of her loans to Hispanic clients; (3) denying her the same support staff that was given to others; (4) retaliating against her for reporting that discrimination; and (5) creating a work environment that was so hostile she resigned her employment.

Chase filed a Motion for Summary Judgment against all claims and a Motion to Strike Portions of Plaintiff's Supporting Affidavits and Declarations. Oral argument was heard and, for the reasons that follow, Chase's Motion for Summary Judgment is denied and its Motion to Strike is denied.

## STATEMENT OF FACTS[1]

Montelongo worked as a home mortgage loan officer for Chase at its branch in Beaverton, Oregon, from June 2002 to April 2004. A loan officer is responsible for originating loans. Montelongo earned in excess of $100,000 in 2003, had a baby in February 2004, "took time off from work for a few weeks after [she] had the baby" and then "was mostly working from home . . . until the time [she] left."

When Montelongo was recruited to be a loan originator by Chase she was asked about her pipeline and was able to bring her customers to Chase and generate meaningful business.

During the period of Montelongo's employment, Ms. Cathy

---

[1]     Chase did not reply to Montelongo's "additional facts in dispute." In accordance with the local rules, the additional facts set forth by Montelongo will be deemed admitted by Chase. See LR 56.1(b)(3); 56.1(f).

Kingery served as the sales manager for the Beaverton branch.  As
sales manager, Kingery worked as both a loan originator, like a
loan officer does, and was charged with helping to support and
train the Beaverton loan officers.  She had no independent
authority to hire, and no responsibility or authority to
discipline or discharge loan officers.  Such authority was
exercised by Regional Operations Manager Patty Tusinski for loan
processors, and Regional Sales Manager Gary Duffy for loan
officers in the Oregon region.

On May 17, 2002, Montelongo completed Chase's candidate
information form and stated that she was earning an average of
$6000-9000 per month at Wells Fargo.  However, from January to
May 2002, it appears that Montelongo averaged only $3200 per
month.

On the "New Hire Form," Montelongo stated that from August
1998 through May 2002, she worked as a loan originator or
mortgage consultant.  However, Chase alleges that, in fact,
Montelongo was not hired in a loan origination position until May
2001.

Chase insists that it never would have hired Montelongo or
would have terminated her had it learned of these alleged
misrepresentations.  However, Montelongo asserts that termination
after this length of service with Chase for the inaccuracies in
her application would be unprecedented.  What action to take
would, according to Human Resources Manager David Schilling, be

dependent upon how "material" the misrepresentation was, and that in turn would relate to how inaccurate and how remote in time the misrepresentation was.  Schilling said he would want to consult with Employee Relations on that issue.  Schilling allowed that within legal limits management retains discretion to excuse a misrepresentation.  Neither Kingery or Duffy has terminated anyone for a misrepresentation on an application after employment for over a year.

Chase alleges that, in early 2003, Duffy met with Montelongo, Kingery and Kim Fee, Montelongo's loan processor, because of concerns regarding Montelongo's performance, including Montelongo signing a form with Fee's name printed on it. According to Chase, Montelongo used this meeting to complain about the loan processing support from the Beaverton staff. Chase claims that Duffy recommended that Montelongo's loans be processed at the West Linn branch, which was less busy than Beaverton.

Chase alleges that as a mortgage officer, Montelongo was not required to be at the branch to originate loans, but would make appointments to meet customers there and would often fail to appear for these appointments.  According to Chase, Montelongo admitted in her deposition that two to three times per week her customers would appear at the branch when she was not there and she frequently could not be reached by cell phone or any other means.  Chase contends that Montelongo's absences and missed

appointments were complicated because her customers frequently spoke only Spanish, and she was the only Spanish-speaking employee in Beaverton.

Chase further alleges that Kingery expressed her concerns to Duffy that the reputation of Chase and the branch would be undercut by Montelongo's performance and poor customer service and asked Duffy to consider whether she should be reassigned to a different branch. Chase claims that Duffy discussed Kingery's concerns and requests with Montelongo. After speaking with Montelongo, Duffy decided against relocating Montelongo.

By email dated May 23, 2003, Montelongo wrote to Duffy to complain about race discrimination at the branch. Montelongo complained about her treatment by Kingery, stating in part: "I feel that I am being discriminated against by [Kingery] and Chase for being a Hispanic woman. I feel this way for many reasons, but one that comes to mind is because she has said she does not like to hear my customers speak a different language. And she does not like to see[] 3-4 people coming for loans." Kingery made numerous racial comments about Montelongo's customers and about Montelongo. Moreover, Fee, who herself had made derogatory comments about Montelongo's Hispanic clients, had refused to service Montelongo's loans. Kingery would yell at some of Montelongo's Hispanic customers.

Chase claims that Schilling investigated Montelongo's assertions. Chase alleges that Montelongo identified the single

incident she complained about in her email saying that Kingery became very irritated with the borrowers. According to Chase, Montelongo also said that Kingery came into the office, angry and irritated with her, and they had a discussion that left Montelongo feeling uncomfortable. Montelongo also complained about her loan processing support. Schilling concluded there was no discrimination after speaking with only Montelongo and Kingery. Schilling did not interview any witnesses, even though his notes reflect that Montelongo told him of the existence of two witnesses. In fact, Schilling has conducted 20-25 discrimination investigations and has never found discrimination.

Chase contends that Kingery denied making the statements attributed to her in Montelongo's email. Chase explains that at the same time, Kingery expressed displeasure in Montelongo because when Montelongo's customers were at the branch for appointments, Montelongo would be absent, could not be reached by cell phone and would be completely unavailable to service her clients.

Chase contends that following the investigation, and finding only one allegation of a potentially discriminatory event, Schilling reported that he did not find discrimination and concluded that various concerns could be addressed by hiring a Spanish-speaking loan processor into the Beaverton branch and made such a recommendation to Duffy, who concurred. Chase determined a Hispanic loan processor, Ben Rangel, should be hired

to help service Montelongo's Hispanic clientele, but he was
terminated a few months later, as part of a nationwide layoff of
loan processors, and Montelongo's loans were given back, in part,
to Fee.

According to Chase, during Rangel's tenure, Montelongo had
no complaints about the processing of her loans.  However, after
the termination of her Hispanic loan processor, Montelongo again
experienced disparate treatment in the processing of her loans,
and they were not getting closed.  Moreover, when he was first
employed, Rangel saw that Montelongo's loans had been ignored,
and afterwards he was not given the training he requested to
adequately support Montelongo.  During Rangel's employment,
Kingery's hostility toward Montelongo continued.

In March 2004, Chase's General Audit Department investigated
and concluded that Montelongo had violated a policy requiring
that all verification of employment (VOE) forms be returned to
Chase directly by the employer.  Montelongo admitted to receiving
a VOE form directly from the borrower, which Montelongo gave to
Fee for inclusion into the file.

Chase alleges that, on March 23, 2004, as recommended by the
Audit Department and directed by Schilling, Duffy issued a
written warning to Montelongo for violation of the policy.  Also
as a result of this investigation the Division Operations Manager
directed Duffy to have all loan files originated by Montelongo

sent to the regional office in West Linn for processing in order to assure quality.

On March 26, 2004, three days after receiving the warning, Montelongo again complained about discrimination and retaliation in an email. Kingery had come into Montelongo's office after her first complaint and screamed and swore at Montelongo and threatened that it had better be the "last [expletive] time." This time Chase's Vice President of Employee Relations, Chase Bright, conducted the investigation, to the same conclusion, despite being given corroborating evidence of the discrimination from two co-workers. Kingery was not disciplined. Like Schilling, Bright has conducted about 100 discrimination investigations and has never found discrimination.

According to Chase, Bright talked to Montelongo several times and talked to several employees, including persons Montelongo identified. Chase alleges that although one person, Pamela Gotham, claimed that Kingery made various derogatory statements, she could not provide any specifics and could not corroborate Montelongo's statements. Chase further alleges that other witnesses could not corroborate or substantiate statements attributed to Kingery by either Gotham or Montelongo. Bright concluded that he could not substantiate Montelongo's race discrimination claims, but that Kingery was very vocal and argumentative with employees and engaged in actions that were not becoming of a manager.

Chase alleges that, on Bright's recommendation, Duffy decided to remove Kingery as a manager and transfer her to another location.  Chase explains that before the changes were implemented, Kingery took a loan officer position at another location that was being developed.

On April 19, 2004, while the investigation was still ongoing, Montelongo was offered and accepted employment at her prior employer, Wells Fargo.  Montelongo applied to work elsewhere, as she had gone three months without making any money because her loans were not being processed.  A day or two before she quit, but after she had already decided to go to work for Wells Fargo and had signed rehire documents, Bright told her she could continue to work at the Beaverton branch and Kingery would not be there.  By that time, however, Montelongo had lost substantial income, her reputation had been damaged in the community with realtors and customers because of the delays in processing her loans.  In addition, Kingery's sister, Marguerite, her nephew and her boyfriend were still be working at the Beaverton branch.  Both Fee and Marguerite had made racial comments and treated Montelongo poorly.  In fact, Marguerite, who drew the loan documents, had stated she would no longer perform that service for Montelongo's customers.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment if no genuine issue exists regarding any

material fact and the moving party is entitled to judgment as a
matter of law.  The moving party must show an absence of an issue
of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323
(1986).  Once the moving party shows the absence of an issue of
material fact, the non-moving party must go beyond the pleadings
and designate specific facts showing a genuine issue for trial.
<u>Id</u>. at 324.  A scintilla of evidence, or evidence that is merely
colorable or not significantly probative, does not present a
genuine issue of material fact.  <u>United Steelworkers of America
v. Phelps Dodge Corp.</u>, 865 F.2d 1539, 1542 (9TH Cir. 1989).

   The substantive law governing a claim or defense determines
whether a fact is material.  <u>T.W. Elec. Serv., Inc. v. Pacific
Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9TH Cir. 1987).  The
court must view the inferences drawn from the facts in the light
most favorable to the non-moving party.  Thus, reasonable doubts
about the existence of a factual issue should be resolved against
the moving party.  <u>Id</u>. at 630-31.  The Ninth Circuit, however,
has stated, "[n]o longer can it be argued that any disagreement
about a material issue of fact precludes the use of summary
judgment."  <u>California Architectural Bldg. Prods., Inc. v.
Franciscan Ceramics Inc.</u>, 818 F.2d 1466, 1468 (9TH Cir. 1987)
(citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475
U.S. 574 (1986)).  When the non-moving party's claims are
factually implausible, that party must come forward with more
persuasive evidence than would otherwise be required.  <u>Id</u>.

**DISCUSSION**

Montelongo alleges claims for hostile work environment, constructive discharge, race-based discrimination, and retaliation under Title VII, section 1981 and state law.[2]  Chase seeks summary judgment against all of Montelongo's claims on the ground that she "pleads but lacks evidence to establish theories of hostile work environment, constructive discharge, disparate treatment or retaliation."  In the alternative, Chase seeks summary judgment against Montelongo's section 1981 claim on the ground it "is based on a voidable contract, on which no cognizable claim can be brought under 42 U.S.C. § 1981."  Also in the alternative, Chase moves for partial summary judgment against certain allegations by Montelongo under Title VII and state law that are untimely; namely, those allegations arising before August 14, 2003, as to the Title VII claim, and before June 15, 2003, as to the state claim.  Finally, Chase moves for partial summary judgment on Montelongo's claim for damages, requesting that any damages cease to accrue as of January 27, 2005, the date

---

[2]     Montelongo's Oregon law claims are analyzed identically to her federal claims as the standards for the state law claim parallel those for Title VII.  <u>Jaurrieta v. Portland Public Schools</u>, 2001 WL 34041143 at *7 and n.12 (D.Or. 2001)(analyzing hostile environment claim under O.R.S. 659.030 under Title VII standards and noting that Oregon courts generally consider and adopt federal case law regarding Title VII); <u>see</u> <u>also</u> <u>Logan v. West Coast Benson Hotel</u>, 981 F.Supp. 1301, 1319 (D.Or. 1997)(in analyzing Oregon discrimination claims under Chapter 659, Oregon courts have looked to Title VII cases for guidance because Oregon statutes are "wholly integrated and related" to Title VII).

Chase discovered the allegedly material misrepresentations made by Montelongo in her application and hiring.

## I. Hostile Work Environment - Harassment

### A. *Prima Facie* Case

#### 1. Legal Standard

To establish a *prima facie* hostile work environment claim under either Title VII or section 1981, an employee must raise a triable issue of fact as to whether: (1) she was subjected to verbal or physical conduct because of her race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter conditions of her employment and create an abusive work environment. Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998). To survive summary judgment, Montelongo must show a disputed question of material fact whether a reasonable Hispanic woman would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and (2) Chase failed to take adequate remedial and disciplinary action. See, e.g., McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004). Courts should consider: the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. Harris v. Forklift Systems, 510 U.S. 17, 23 (1993).

2.   <u>Analysis</u>

Chase challenges Montelongo's hostile work environment claim
on the ground that none of the allegedly racially or ethnically
derogatory statements were directed toward her.  Rather, the
alleged statements were directed at customers.  According to
Chase, under Ninth Circuit standards, Montelongo cannot state a
hostile work environment claim; her allegations are insufficient
as a matter of law.

Viewing the evidence in the light most favorable to
Montelongo, the record includes allegations of conduct of a
racial nature and conduct engaged in because of Montelongo's
race.  There is some evidence of the following:

-   In 2003, Gotham told Montelongo that Kingery said she
    "can't stand Mexicans," and "she hated it when the
    customers were at the lobby waiting for [Montelongo]
    when they were speaking Spanish.";

-   Montelongo overheard Kingery say to herself that she
    could not stand it when her customers were speaking
    Spanish.;

-   Kingery referred to Montelongo's clients as "damn
    Mexicans" and "f___ing Mexicans" and she said that they
    were "no good".;

-   Kingery stated that she "can't understand [Montelongo]
    because of that f___ing accent.";

-   After Montelongo complained about Kingery, Kingery went
    into her office and screamed and swore at her, and told
    her she had no right to complain about her or anyone
    else in the office and that it had better be the "last
    f___ing time.";

-   Kingery was disrespectful toward Montelongo's Spanish-
    speaking clients, the Torres, who were Cuban.  Kingery
    was being "rude with [Mr. Torres] and yelled at him."
    In addition, Kingery "made negative comments

about . . . them being Cubans.  Kingery also said the Torres "were annoying, and that she couldn't stand that, and that she was about [to] get ready to kick them out of the office.";

- In April 2003, Kingery stated that Montelongo's customer, Nolan Canales, "was a pain in the--in the ass because he kept calling to get a status on his loan. And then one time he came in to--to drop off a document that [] was needed, and we were in the office and talking, and [Kingery] came in, open--she opened the door of my office, and she yelled at him--at us. . . . She said that we were loud, that it was annoying, and to keep it quiet.  But she said it in a very rude way, that I felt bad for the customer.";

- Kingery asked Duffy to have Montelongo work out of a different branch because of "customer service issues," not making appointments and having customers in the lobby was causing some issues of disruption.;

- Duffy told Montelongo that Kingery wanted her to work elsewhere and that she told him her reputation was going to be affected by having Montelongo's Hispanic customers serviced at her office.;

- Montelongo's loan processor, Fee, had refused to service her loans, and Montelongo's loans were sent to another officer, where everyone else's were processed at the branch in Beaverton;

- Montelongo's loans were ignored and backed up for months, allegedly because she was Hispanic.;

- Montelongo had to do some of her own loan processing work, allegedly because she was Hispanic.;

- Fee was always complaining or questioning the integrity of Montelongo's loans, even when there was no reason. Montelongo was required to do some of Fee's duties in terms of ordering appraisals, title, or escrow because she was not getting the support she needed from Fee, allegedly because she was Hispanic.

- Montelongo's documents were either put on hold, or were not drawn with the same timeliness given to others, allegedly because she was Hispanic;

–  While Montelongo was on maternity leave, Kingery called her to inform her that Kingery was giving Montelongo's office to John Fischer, Kingery's boyfriend.

For purposes of summary judgment, Montelongo has raised a question of fact whether she was subjected to a racially hostile work environment at Chase. She has presented evidence that over a 22-month period numerous incidents occurred, ranging in severity from being called racially derogatory names to experiencing impediments to performing her job successfully, including interference with her compensation.

## II.  Constructive Discharge

Chase insists that there is no basis for Montelongo to claim constructive discharge because: (1) a few alleged remarks about customers over a two-year period are insufficient to meet her burden; and (2) she failed to utilize Chase's internal complaint procedures set forth in its corporate harassment policy.

To establish constructive discharge, under federal law, a plaintiff must show that "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign[.]" <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 124 S.Ct. 2342, 2351 (2004).

Under Oregon law, a plaintiff must prove that:

(1) the employer intentionally created or intentionally maintained specified working conditions; (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of the them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions *or* knew that the employee was certain, or substantially certain, to leave employment as a result of those working

conditions; and (4) the employee did leave employment as a result of those working conditions.

McGanty v. Staudenraus, 321 Or. 532, 557, 901 P.2d 841 (1995)(emphasis in original, footnotes omitted).

Based on the record as a whole, Montelongo alleges that Chase subjected her to a constructive discharge based on the discriminatory comments and differential treatment (set forth above); Chase's conduct subjected her to a significant pay reduction (lost commissions); and a jury could infer Chase created and maintained the intolerable working conditions based on the evidence that Kingery continued to harass Montelongo even after Montelongo complained to Chase. Viewing the evidence in the light most favorable to Montelongo, she has established a material question of fact whether her working conditions were so intolerable and discriminatory that she was compelled to leave. In particular, the evidence of interference with Montelongo's compensation. Namely, the allegation that Montelongo was unable to close any loans for a period of three months immediately prior to her departure, as well as allegations of continuous overt harassment by Kingery and others despite Montelongo's complaints.

Once the court concludes, for purposes of summary judgment, that Montelongo may have suffered a hostile work environment, it must next consider whether Chase is liable for the harassment. In 1998, the Supreme Court set forth a new test for determining when an employer is vicariously liable for a hostile work environment created by a supervisor. See Burlington Industries,

<u>Inc. v. Ellerth</u>, 524 U.S. 742 (1998); and <u>Faragher v. Boca Raton</u>, 524 U.S. 775 (1998).  In those cases the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee."  <u>Faragher</u>, 524 U.S. at 807.  An employer is not liable, however, for constructive discharge where it has implemented a "readily accessible and effective policy for reporting and resolving complaints of [racial] harassment" and the employee "unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus."  <u>Suders</u>, 124 S.Ct. at 2347.

The Supreme Court provided employers with this affirmative defense to the vicarious liability created by the misconduct of its supervisors, in part, to encourage employers to adopt anti-harassment policies.  The Court allowed that:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

<u>Ellerth</u>, 524 U.S. at 762-763; <u>Faragher</u>, 524 U.S. at 807-808.

The Court set forth the requirements of the two necessary elements of the affirmative defense:

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

Ellerth, 524 U.S. at 765.

Based on its reading on these two Supreme Court decisions, the Ninth Circuit in Burrell v. Star Nursery, Inc., 170 F.3d 951 (9th Cir. 1999), found that:

> [T]he new rule focuses on whether the harasser has immediate or successively higher authority over the victim of the harassment, not on whether the employer knew about the harassment. Thus, if the harassment is actionable and the harasser has supervisory authority over the victim, we presume that the employer is vicariously liable for the harassment. This presumption may be overcome only if the alleged harassment has not culminated in a tangible employment action, and then only if the employer can prove both elements of the affirmative defense.

Id. at 956 (citations omitted).

　　2. Analysis

The record establishes that at least one of the people responsible for creating a hostile work environment for Montelongo had immediate or successively higher authority over her, i.e., Kingery, thereby satisfying the first part of the Ellerth and Faragher test. Next, the court must consider whether

Montelongo suffered a "tangible employment action" such that an affirmative defense would be precluded. Ellerth, 524 U.S. at 765. ("No affirmative defense is available . . . when a supervisor's harassment culminates in a tangible employment action.").

Tangible employment actions are those that "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. Id. at 762. Finally, a tangible employment action need not cause economic harm to the employee. Holly D. v. California Institute of Technology, 339 F.3d 1158, 1170 (9th Cir. 2003).

With respect to the case at hand, the Supreme Court has recently considered whether a constructive discharge brought about by supervisor harassment constitutes a tangible employment action and, therefore, precludes assertion of the affirmative defense set forth in Ellerth and Faragher. See Suders, 124 S.Ct. 2342. In Suders, the Court determined that: "[A]n employer does not have recourse to the Ellerth/Faragher affirmative defense when a supervisor's **official act** precipitates the constructive discharge; absent such a 'tangible employment action,' however,

the defense is available to the employer whose supervisors are charged with harassment." Id. at 2351 (emphasis added).

During oral argument, counsel for Montelongo argued that Kingery's conduct here satisfies the requirement for an official act by the employer such that it would bar Chase from asserting the affirmative defense. Specifically, Montelongo's counsel explained that Kingery's conduct resulted directly in lost commissions--a reduction in compensation--to Montelongo. As such, it was an "official act" reflected in Chase's records. See id. at 2355 ("[A]n official act reflected in company records--a demotion or a reduction in compensation, for example--shows 'beyond question' that the supervisor has used his managerial or controlling position to the employee's disadvantage.").

There are allegations to support a constructive discharge-- impediments to Montelongo performing her job that resulted in loss of income (economic harm), undesirable work conditions and permitted continued harassment by coworkers. The record before the court includes evidence (discussed above) that the harassment by Kingery and others may have interfered with Montelongo performing her duties and that resulted in a reduction in compensation for Montelongo in the form of lost commissions. This could constitute an official act (reduction in pay) that would be imputed to Chase for purposes of liability. Because the actions of Kingery may constitute an official act for purposes of

determining whether Montelongo suffered a tangible employment action, summary judgment is not appropriate.  Accordingly, the court need not reach the next steps of the analysis, i.e., whether Chase, without contradiction, exercised reasonable care to prevent or promptly correct any racially harassing behavior; or whether Chase can establish that Montelongo unreasonably failed to take advantage of any preventive or corrective opportunities provided by Chase or to otherwise avoid harm.  As stated above, the affirmative defense is unavailable when a supervisor's official act precipitates the constructive discharge.  Accordingly, Chase is not entitled to summary judgment on the <u>Ellerth</u> and <u>Faragher</u> affirmative defense as there is a question of fact whether Chase is strictly liable for Kingery's misconduct.

**III. Discrimination and Retaliation - Disparate Treatment**

    **A.**    *Prima Facie* **Case**

        1.   <u>Legal Standard</u>

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Additionally, section 1981 provides relief for race-based discrimination.  To prevail in a Title VII claim or section

1981[3], an employee must establish a *prima facie* case of discrimination.  Unlawful discrimination is presumed if plaintiff can show that (1) she belongs to a protected class, (2) she was performing according to his employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to hers were treated more favorably.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

To make out a *prima facie* case of retaliation under Title VII ("opposition clause" of 42 U.S.C. § 2000e-3(a)) or section 1981, an employee must establish that : (1) she engaged in protected activity, such as filing of a complaint alleging racial discrimination; (2) the employer subjected her to adverse employment action; and (3) a casual link exists between the protected activity and the adverse action.  Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003).

Chase charges that Montelongo cannot satisfy her *prima facie* case of either discrimination or retaliation because she was not subjected to an adverse employment action or disparate treatment.

---

[3] To establish a claim under section 1981 plaintiff must prove that he or she was subjected to intentional discrimination based upon his or her race, rather than solely on the basis of the place or nation of their origin or their religion.  A plaintiff may seek relief under both Title VII and section 1981 for racial discrimination in employment.  Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1412 (9th Cir. 1987).  The same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim.  Id.

For example, Chase insists that the reassignments of processing support for Montelongo's loans from Beaverton to West Linn in 2003 and 2004 were for legitimate business purposes.  In addition, Chase maintains that non-Hispanic employees were treated similarly.  For purposes of Montelongo's retaliation claim, Chase also contends that there was no nexus between Montelongo's complaints and any employment action by Chase.

A majority of the federal Circuit Courts, including the Ninth Circuit, take an expansive view of the type of actions that can be considered adverse employment actions.  See, e.g., Ray v. Henderson, 217 F.3d 1234, 1241-1243 (9th Cir. 2000).  In Ray, the Ninth Circuit held that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity.  Among the employment actions that may constitute an adverse employment action under federal law depending on the circumstances are termination, dissemination of an unfavorable employment reference, issuance of an undeserved negative performance review, refusal to consider for promotion, exclusion from meetings, seminars and positions providing eligibility for salary increases, denial of secretarial support, a more burdensome work schedule, and a lateral transfer. Id. at 1241; see also Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000).  Moreover, in Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2004), the Ninth Circuit determined that the standard –- reasonable likely to deter

employees from engaging in protected activity -- was at least in part a subjective one as viewed by the charging party.

Viewing the facts in the light most favorable to Chase, there is some evidence that Chase subjected Montelongo to the following "adverse treatment:" (1) Montelongo was not provided adequate loan processing support for her Hispanic clients, resulting in economic loss; and (2) Chase tolerated harassment of Montelongo by both her supervisor and coworkers, resulting in an alleged constructive discharge. Based on the foregoing, the court finds that Montelongo has proffered sufficient facts to establish that she suffered an "adverse employment action," the second and third prongs (respectively) of her *prima facie* cases for <u>retaliation</u> and <u>discrimination</u>.

To satisfy the final element of her *prima facie* case for <u>retaliation</u>, Montelongo must show a causal link existed between the protected action and the adverse action. To satisfy the final element of her *prima facie* case for <u>discrimination</u> Montelongo must show that she was treated differently from similarly situated employees.

It is undisputed that Montelongo was engaged in protected activity. Indeed, in an email to Duffy, dated May 23, 2003, Montelongo wrote, in part: "I feel that I am being discriminated against by [Kingery] and Chase for being a Hispanic Woman. . . .

It is clear this is a discrimination issue. . . ."[4]  The court

finds that this reporting constituted a "protected activity"

under Title VII.  Chase contends, however, that Montelongo was

reporting only a single incident of misconduct and, in any event,

there is no nexus between her complaint and an employment

decision by Chase to establish a claim for retaliation.

Under Ninth Circuit law, "[c]ausation sufficient to

establish a *prima facie* case of unlawful retaliation may be

inferred from the proximity in time between the protected action

and the allegedly retaliatory [adverse employment action]."

Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731 (9th Cir.

1986).  Additionally, the courts will also look to the "attending

circumstances that suggest something other than legitimate

reasons for the temporal tie."  Portland Ass'n of Teachers v.

Multnomah Sch. Dist. No. 1, 171 Or.App. 616, 625, 16 P.3d 1189,

1197 (2000).  These attending circumstances may include

---

[4]      Shortly before Montelongo departed Chase, she again
complained of her treatment in an email to Schilling.  In that
March 26, 2004 email, Montelongo wrote, in part:

> I feel that I am being discriminated against by my
> immediate manager, and her friends and family that she has
> hired. . . .  I do not deserve to be forced out of my job
> because my boss and co-workers do not like me because I
> am a Hispanic female. . . .  I do not deserve to be
> treated differently because of my race and sex and my
> language. . . .  It is not acceptable that [Kingery] comes
> to my office, shuts the door and screams at me, swears at me
> and threatens that I had no right to complain about her to
> anyone and it had better never happen again.  But it has to
> be done.  She is discriminating against me because I am a
> Hispanic female.

inconsistent application of policies or any other circumstances that suggest the employer had a retaliatory motive. <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 977-978 (9th Cir. 2003).

Regarding the timing (nexus) of the "adverse treatment" there is evidence that shortly after Montelongo sent the May 2003 email, Kingery entered Montelongo's office and screamed and swore at her, and told her she had no right to complain about her or anyone else in the office and that it had better be the "last f___ing time."  After Rangel's departure, Montelongo was not able to process any loans for a two or three month period, resulting in lost commissions; Montelongo did not have access to Internet leads or external email; her loan documents were either delayed or put on hold; and Kingery and certain coworkers continued to harass Montelongo and her Hispanic clients.

Based on the foregoing, the court finds that Montelongo has presented sufficient evidence to demonstrate a causal link between her protected activity and the adverse actions taken against her as required to state a *prima facie* claim of retaliation for complaining about race discrimination under. Thus, Montelongo has stated a *prima facie* case for <u>retaliation</u>.

With respect to the fourth and final element of Montelongo's *prima facie* case for <u>discrimination</u>, Chase challenges Montelongo's case for discrimination on the ground that it did not treat Montelongo differently than other similarly situated employees.  Under Title VII, an individual suffers disparate

treatment "when [s]he . . . is singled out and treated less favorably than other similarly situated on account of race." Jauregui v. City of Glendale, 852 F.2d 1128, 1134 (9th Cir. 1988)(quotations omitted); accord McGinest, 360 F.3d at 1122-1123.  "Individuals are similarly situated when they have similar jobs and display similar conduct."  Vasquez, 349 F.3d at 641.

Chase alleges the following non-Hispanic employees were treated just like Montelongo under similar circumstances:

- At least one other non-Hispanic loan officer had her loans reassigned from another location to the West Linn regional office for processing.;

- Other non-Hispanic loan officers would routinely handle some of their own loan processing.

In response to this evidence, Montelongo is able to point to numerous instances in which she has been treated differently from similarly situated employees.  There is some evidence of disparities between Montelongo's treatment and that of other similarly situated Chase employees as follows:

- Montelongo's constructive discharge that followed months of enduring a hostile environment and economic loss;

- While Montelongo's loans were sent to West Linn, the loans of other non-Hispanic officers were processed at the Beaverton branch;

- Montelongo was denied support staff that was available to other non-Hispanic loan officers;

- Montelongo was denied Internet leads and external email access that was available to other non-Hispanic loan officers.

Finally, at least two other employees, Pamela Gotham and Jodi Whitton, have testified that Montelongo was harassed and treated differently from other non-Hispanic loan officers. Gotham, a loan officer for Chase, stated in her declaration, in part, that:

> 3. From my knowledge and experience as a loan officer I can affirm that Veronica Montelongo was not given the support that she required to successfully perform her duties as a loan officer while she was employed at the Beaverton office of [Chase].
>
> . . . .
>
> 5. During the time I was employed at the Beaverton office of [Chase] Kimberly Fee was the main loan processor in the office and she regularly refused to process Ms. Montelongo's loans.
>
> 6. When Ms. Montelongo's loans would be processed by Ms. Fee and issues would arise that would hinder the processing of the loans, Ms. Fee would withhold the information from Ms. Montelongo so that she could not do anything to remedy the problem.
>
> . . . .
>
> 8. When Ms. Kingery chose to have Ms. Montelongo's loans sent to the West Linn office of [Chase] for processing it was a substantial hardship on Ms. Montelongo and her business interests.

In her affidavit, Gotham stated, in part, that:

> 3. When I was in the Beaverton office I heard Ms. Kingery make frequent derogatory statements about Hispanics . . . .
>
> 4. I also observed that Ms. Kingery would make derogatory comments about Ms. Montelongo. . . . I heard her say that Ms. Montelongo's grasp of English was so poor she did not understand how to do the job. . . .

Similarly, in her affidavit, Jodi Whitton, Kingery's personal assistant, stated, in part, that:

4.  While I worked in the Beaverton, Oregon office I heard Cathy Kingery make racially derogatory statements about Hispanics on at least four occasions.  She would literally scream the statements in the office loud enough for everyone, including the Hispanic customers, to hear.

5.  I also heard Kim Fee refuse to process Ms. Montelongo's files. . . .

Disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment.  Viewing the foregoing evidence and all reasonable inferences in the light most favorable to Montelongo, a trier of fact could find that Montelongo was treated differently from similarly situated non-Hispanic employees sufficient to satisfy the fourth and final prong of her *prima facie* case for race discrimination.  Thus, Montelongo has stated a *prima facie* case for race <u>discrimination</u>.

**B.  Legitimate Non-Discriminatory Reason**

    1.  <u>Legal Standard</u>

Once the complainant has made a *prima facie* showing of discrimination or retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action.[5]  <u>See</u>, <u>e.g.</u>, <u>Rivera v. Tressource Indus.,</u>

_____

[5]  While the court will proceed with the <u>McDonnell Douglas</u> framework in this instance, it is worth noting that the Ninth Circuit recently stated that:

[A]lthough the <u>McDonnell Douglas</u> burden shifting framework is a useful tool to assist plaintiffs at the summary judgment state so that they may reach trial, nothing compels the parties to invoke the <u>McDonnell Douglas</u> presumption. Rather, when responding to a summary judgment motion, the

(continued...)

<u>Inc.</u>, 2005 WL 608265 (D.Or. 2005)(citing <u>Wallis v. J.R. Simplot</u>, 26 F.3d 885, 889 (9th Cir. 1994)).  To "articulate" a legitimate reason for an employment decision does not mean to express an argument; it means to produce evidence.  <u>Rodriguez v. GMC</u>, 904 F.2d 531, 533 (9th Cir. 1990).

    2.  <u>Analysis</u>

Chase asserts that there were legitimate, non-discriminatory reasons and a lack of differential treatment for all of the alleged conduct.  Specifically, Chase maintains that the discipline imposed on Montelongo was reasonable and justified. As discussed above, Chase asserts that at least one other non-Hispanic loan officer had her loans reassigned from another location to the West Linn regional office for processing. Moreover, Montelongo's loan processing was reassigned to West Linn because Montelongo was dissatisfied with the support she received in Beaverton.  The office in West Linn had excess capacity, and the move was offered as a way to provide better service for Montelongo, which she thought was needed.  As for the March 2004 reassignment of loans to West Linn, that action was

---

[5](...continued)
plaintiff is presented with a choice regarding how to establish his or her case. [Plaintiff] may proceed by using the <u>McDonnell Douglas</u> framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [defendant].

<u>McGinest</u>, 360 F.3d at 1122 (quotations omitted).

compelled and justified by Montelongo's serious breach of Chase's VOE policy which resulted in a warning.

With the addition of Rangel to help handle Spanish-speaking clientele for five months between July and December 2003, Montelongo was given more support than other loan officers. Moreover, other non-Hispanic loan officers routinely handled some of their own loan processing. Finally, Chase explains that Montelongo had access to Internet leads and external email through Chases's self-activating Intranet system. Based on these assertions of non-discriminatory intent, Chase maintains that Montelongo's claims fail as a matter of law and must be dismissed.

## C. Pretext

### 1. Legal Standard

If the employer is able to articulate a legitimate non-discriminatory reason for the adverse employment action, the complainant bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. Ray, 217 F.3d at 1240. "[P]laintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1127 (9th Cir. 2000).

2.   <u>Analysis</u>

Montelongo insists that Chase's asserted legitimate reasons are pretextual.  In support, she reiterates her allegations that Chase treated her differently than similarly situated non-Hispanic employees by denying her the same support staff given to others.  In addition, the hostile treatment experienced by Montelongo during her employment, which included being subjected to a hostile work environment and culminated in a constructive discharge, is evidence of pretext.  Next, Montelongo charges that Chases's "inadequate and biased investigation are evidence of pretext."  Finally, Gotham and Whitton testified that Montelongo was harassed and treated differently from similarly situated non-Hispanic loan officers.

Thus, the legitimacy of Chase's non-discriminatory reasons raises factual issues that must be resolved by a jury.  Chase's request for summary judgment on Montelongo's claims for discrimination and retaliation are denied.

**IV.  Fraud**

Chase relies on the after-acquired evidence doctrine, set forth by the Supreme Court in <u>McKennon</u>, to argue that Montelongo's alleged fraud in misrepresenting her prior experience limits her damage remedies to the date of discovery, which is no later than when Montelongo was deposed on January 27, 2005.  <u>See</u> <u>McKennon v. Nashville Banner Publishing Co.</u>, 513 U.S. 352 (1995).  In addition, Chase relies on the Ninth Circuit's

decision in <u>Addisu</u> to argue that the alleged fraud in Montelongo's application process bars her section 1981 claim. <u>See</u> <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130 (9th Cir. 2000).

The after-acquired evidence doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later "discovers" evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct. <u>McKennon</u>, 513 U.S. at 360-363. In <u>McKennon</u>, the Supreme Court, interpreting the ADEA, concluded that: "as a general rule in cases [involving after-acquired evidence of wrongdoing], neither reinstatement nor front pay is an appropriate remedy." <u>Id</u>. at 361-362. Further, the court held that: "[o]nce an employer learns of about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." <u>Id</u>. at 362.

In addition to limiting recovery of damages to January 27, 2005, Chase also maintains that summary judgment should be granted on Montelongo's section 1981 claim because Montelongo misrepresented her background in applying for the loan officer position and, thus, fraudulently entered into an employment contract. Chase contends that Montelongo's alleged misrepresentations resulted in a void contract, which neither

party could enforce, and thus Chase was free to terminate the
employment relationship without any potential section 1981
liability.  See Addisu, 198 F.3d 1130.

In Addisu, plaintiffs alleged that defendant refused to sell
them Levi's jeans because of their race or color.  Id. at
1133-34.  Defendant responded that plaintiffs were not the
ultimate consumers purchasing the jeans for their personal use,
and that its contract with the manufacturer prohibited sales to
re-sellers or dealers.  Id.  The Ninth Circuit held that because
plaintiffs fraudulently misrepresented their status, any contract
made by the parties would have been voidable, and "a voidable
contract . . . is not cognizable under § 1981."[6]  Id. at 1138.

Regardless, the court must reject Chase's argument at this
stage of the proceedings.  A genuine issue of material fact
exists as to whether Montelongo's employment contract was

_____

        [6]      The court notes that in McKennon, the Supreme Court
determined that after-acquired evidence does not bar recovery
because "[t]he employer could not have been motivated by
knowledge it did not have and it cannot now claim that the
employee was fired for the nondiscriminatory reason."  513 U.S.
at 360.  The Supreme Court's holding in McKennon applies to
various statutes intended to eliminate workplace discrimination.
The question here is whether the protection from after-acquired
evidence set forth in McKennon, already determined to be
applicable in ADEA and Title VII cases, is applicable to section
1981 claims.  As amended in 1991, a purpose of section 1981 is to
deter and eliminate workplace discrimination.  Although it would
seem to frustrate the Congressional scheme protecting employees
from workplace discrimination if defendants were able to use
after-acquired evidence of wrongdoing to defeat a suit, the court
is aware of its duty to follow the Ninth Circuit's decision in
Addisu, which declined to extend McKennon to include section 1981
claims on the basis of differing statutory goals.

voidable.  In order to prove that a contract is voidable, a party
must not only show a misrepresentation, but also show that the
misrepresentation was fraudulent or material, and that the
misrepresentation induced the recipient justifiably to rely on
it.  <u>See</u> Restatement (Second) of Contracts § 164.

The burden is on Chase:  "Where an employer seeks to rely
upon after-acquired evidence of wrongdoing, it must first
establish that the wrongdoing was of such a severity that the
employee in fact would have been terminated on those grounds
alone if the employer had known of it at the time of the
discharge."  <u>McKennon</u>, 513 U.S. at 362-363.  While Chase has
enumerated two alleged misstatements in Montelongo's application-
-prior experience and income--it has failed to establish that it
relied on the misrepresentations, especially considering the
evidence that Montelongo was recruited by Chase for the position
of loan officer.  Further, while there is evidence of other
terminations by Chase for misrepresentations in the employment
application, those instances are not squarely on point.[7]

---

[7]     In support of its claim that Chase would have fired
Montelongo had it know of her misrepresentations regarding her
prior experience and prior earnings, Chase submitted the
declaration of Schilling.  In his declaration, Schilling set
forth instances in which five employees were terminated following
post-hire discovery of resume or application fraud.  All five of
those employees had misrepresented their education history and
had worked for Chase less than one year.  Schilling's declaration
continues:  "I am aware of no employees who made material
misrepresentations or errors in the hiring or application
process, such as those made by Ms. Montelongo, who have not been
(continued...)

Chase has failed to establish, as a matter of law, the affirmative defense that after-acquired evidence of Montelongo's misconduct bars her recovery under section 1981. Disputed questions of fact remain whether Montelongo did indeed make material misrepresentations during the application process. Further, there is a question of fact whether Chase would have terminated Montelongo on that basis after several years of service, or whether Chase would have continued to receive the benefit of their contract by continuing to employ Montelongo. Because material questions of fact remain, it is premature for the court to make a determination regarding a limitation of Montelongo's remedies or whether her section 1981 claim is barred because she entered a voidable contract. Chase's request for summary judgment on the question of Montelongo's damages and her section 1981 claim is denied.

## V.    Statute of Limitations - Title VII/State Claims

Montelongo filed her administrative charge with the Bureau

---

[7](...continued)
terminated."
    In his deposition, Schilling admitted, however, that he never personally experienced a situation in which someone had worked for Chase for two years and there was a discovery of a misstatement on their application. In addition, Schilling could not recall a case in which someone was discharged after a lengthy period of employment for a misstatement concerning previous employment with respect to the amount of compensation they had received. Finally, Schilling stated in his deposition that prior to terminating someone for a misrepresentation on an employment application, a determination is made whether the misrepresentation was material.

of Labor and Industries (BOLI) on June 15, 2004.  That filing

also serves as the filing of a charge with the Equal Employment

Opportunity Commission (EEOC).  Chase contends that Montelongo's

state law discrimination claim is timely only as to unlawful

employment practices that occurred on or after June 15, 2003, one

year prior to the filing of her administrative charge.  See Or.

Rev. Stat. §§ 659A.820(1), 659A.875.

Similarly, Chase maintains that to be timely under Title

VII, Montelongo must have filed her administrative charge within

300 days of the occurrence of an alleged unlawful employment

practice.  See 42 U.S.C. § 2000e-5(e)(1).  Under Title VII,

filing a timely administrative charge is a necessary prerequisite

to bringing a civil action.  See Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 108-109 (2002).  According to Chase,

Montelongo's Title VII claim is timely only as to unlawful

employment actions that arose on or after August 14, 2003.  Chase

concludes that under both state law and Title VII, Montelongo's

retaliation claim based on Kingery's comments is untimely,

including Montelongo's May 23, 2003, email complaint.

In Morgan, the Supreme Court held that an employee who

initially files a charge of discrimination with a state agency

must file a charge with the EEOC within 300 days of the alleged

unlawful employment practice in order to preserve the claim for a

subsequent civil action under 42 U.S.C. § 2000e-5(e)(1).  536

U.S. at 109.  The Court explained:

> [D]iscrete discriminatory acts are not actionable if time
> barred, even when they are related to acts alleged in timely
> filed charges. Each discrete discriminatory act starts a new
> clock for filing charges alleging that act. The charge,
> therefore, must be filed within the . . . 300-day time
> period after the discrete discriminatory act occurred. The
> existence of past acts and the employee's prior knowledge of
> their occurrence, however, does not bar employees from
> filing charges about related discrete acts so long as the
> acts are independently discriminatory and charges addressing
> those acts are themselves timely filed. Nor does the statute
> bar an employee from using the prior acts as background
> evidence in support of a timely claim.

Id. at 113; see also Cherosky v. Henderson, 330 F.3d 1243,
1245-47 (9th Cir. 2003)(Court declined to treat a series of
related employment decisions as a pattern or practice, but rather
found that each decision was a discrete act.).

Thus, any claims that Montelongo seeks to assert for a
discrete discriminatory act that occurred prior to June 15, 2003,
and August 14, 2003, respectively, are not actionable.
Nonetheless, there is evidence indicating that at least some
discrete acts occurred within the 300-day time frame; in
particular, Chase's alleged constructive discharge of Montelongo,
and, thus, her claims for disparate treatment are not time
barred.  See id. at 114 (listing the "termination" as one example
of a discrete act).

In addition, some of the alleged events occurred after June
15, 2003, and August 14, 2003 respectively.  To determine whether
all of the events constitute "one unlawful employment practice,"
the court must consider whether they were "sufficiently severe or
pervasive," and whether the earlier and later events amounted to

"the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same managers." <u>Id</u>. at 116,118 (citations and internal quotation marks omitted). Moreover, the Supreme Court's holding in <u>Morgan</u> does not require that the most egregious of the harassing events occur within the 300-day period, nor does it demand that the harassing conduct continue to escalate over time in order for a hostile work environment claim to be actionable.   <u>Id</u>. at 117.

Viewed in the light most favorable to Montelongo, the record contains sufficient evidence to permit an inference that Kingery and others had created a racially hostile environment that persisted beyond June 15, 2003, and August 14, 2003, respectively.  Much of their alleged conduct, when taken together as a whole, was sufficiently severe and pervasive to create an abusive work environment.  Therefore, the court finds that Montelongo's hostile work environment claim is not time barred.

**VI.  Motion to Strike**

Chase requests that portions of affidavits and declarations of Jodi Whitton, Pamela Gotham and Ben Rangel filed by Montelongo in opposition to Chase's Motion for Summary Judgment be stricken. Chase contends that certain identified statements from Whitton, Gotham and Rangel are not based on personal knowledge, are conclusory and do not set forth specific facts and, therefore, must be stricken.

Montelongo responds that the affidavits of Gotham and Whitton and the declarations of Gotham and Rangel are sufficiently specific. In addition, Montelongo maintains that the challenged affidavits and declarations demonstrate sufficient personal knowledge of others' motivations and states of mind.

For purposes of summary judgment, the court denies Chase's Motion to Strike. Chase is granted leave to renew its objections to portions of Whitton's, Gotham's and Rangel's testimony at the time of trial.

**CONCLUSION**

Based on the foregoing, Chase's Motion for Summary Judgment (doc. #24) and Motion to Strike (doc. #41) are DENIED.

IT IS SO ORDERED

DATED this 22nd day of September, 2005.


    /s/ Donald C. Ashmanskas
      DONALD C. ASHMANSKAS
    United States Magistrate Judge